The next case for argument, Jason Goode v. Ron Cook. This case is about whether defendants violated the Eighth Amendment by keeping Mr. Goode in solitary confinement for five years for exhibiting the symptoms of his mental illness. There is sufficient evidence for a jury to determine that these conditions posed an unreasonable risk of serious harm in light of contemporary standards of decency, and that defendants were aware of and disregarded that risk. There are at least three pieces of evidence from which a jury could determine that these conditions posed an unreasonable risk. First, Mr. Goode's mental health needs score, as provided by the Department of Corrections, increased during his time in solitary confinement. Second, Mr. Goode himself said that the conditions of solitary confinement triggered his mental illness, and this was something that was also noted by Defendant Reichel and by Mr. Goode's expert, Dr. Hilbrand. Third, this is also evidenced by the number of disciplinary violations that Mr. Goode accrued while he was in solitary confinement. Well, isn't that circular? I'm just wondering that, like, the number of disciplinary violations is attributable to his mental illness, isn't it? The state's experts say that that's not true because the most serious violations were the result of planning and premeditation and intentional action, which are fundamentally inconsistent with Mr. Goode's diagnosis. There's a dispute about specifically his disciplinary violations that he accrued while he was in administrative segregation. During the two-and-a-half-year period from January 2019 to June 2022, he accrued more than half as many disciplinary violations as he had accrued in his prior nearly 25 years incarcerated. So there's evidence that a jury could infer that the conditions specifically of administrative segregation were leading him to accrue more disciplinary violations as a result of his untreated mental illness. When you get to the subjective prong, it's my understanding that your client conceded that the defendants were not aware of his mental health status or concerns. So if that's the case, how did the trial court get it wrong in granting summary judgment? If they weren't aware, let's leave aside whether that issue was preserved below or argued below. But if these defendants, your client conceded, were not aware of his mental health, how does he succeed on a subjective prong? Mr. Goode, as a pro se litigant throughout the summary judgment proceedings, may not have been exact in how he presented his evidence. But there is evidence from the records that defendants in their own declaration said that they, as members of the classification committees, had full access to his institutional records. Well, full access, but I thought in his submissions to the trial court, he conceded that they were not aware of his mental health needs. Do you agree with that concession that he made? I would need to look into that. I don't remember seeing that. But if he made that concession, I think that there's still evidence in the record from which a jury could determine that, based on their access to his records, and specifically including Nurse Reichel's notes about the treatment that she provided and the fact that— But do those records—I mean, putting aside whether there's a concession, I mean, assume for the moment that there's not, with regard to that subjective prong. So what you have is that these individuals, the two, I guess, warden defendants, they're aware that he's receiving mental health treatment of some kind, but the standard is essentially they have to have been aware of and disregarded a substantial risk to his present or future health. What is there in the record to suggest that? The fact that they know, yes, they know he's in solitary confinement, unless he can assume as well, they know generally that there are concerns that people have about how this prolonged periods of solitary confinement can be harmful to people. But, again, the subjective prong has to show that they were aware of a specific risk to him and disregarded it. And so I guess I'm wondering what you have beyond sort of a—what almost seems like a presumption that when you have someone who's mentally ill and you have them in prolonged solitary confinement, that that means that the individuals responsible for their custody are aware of the risk and disregarding it. I think specifically here for Mr. Goode, he was diagnosed with a behavioral disorder, the symptoms of which include uncontrolled aggressive outbursts, and that was the regular disciplinary violations that he was charged with while he was in administrative segregation at a much higher rate than before he was in administrative segregation. And there was also the fact that he just continued to not progress out of administrative segregation. So even though we're only challenging his placement there from 2019 onward, he was there for a period of over seven years, and he was just unable to continue—he was unable to progress out of the program because his uncontrolled mental illness led to him continuing to accrue disciplinary violations, which then led to him being unable to progress out of administrative segregation, such that he was just held there for years on end. And even though now defendants have transferred him to a different facility, there's no evidence that he completed the program. Step three of the program requires a prisoner to be transferred to Garner, and he was never transferred to Garner. So it seems like for now he's just temporarily in another facility, but there's no evidence that he will ever be able to progress out of administrative segregation if he's placed there again because— So you're saying that in—I thought I read in the state's brief that he has progressed out of the program out of the different phases. He's no longer in solitary—in segregation or solitary confinement. I don't know where—we have no evidence of the record that he progressed out of the program. There's no evidence that he was ever transferred to these other facilities that he would be required to in order to complete the steps of the program, it seems like. What about Governor Lamont's executive order? Doesn't that moot out the case, certainly with respect to injunctive relief? No, because, first of all, there is a dispute about how much time Mr. Goode actually got out of his cell. But even besides that, Mr. Goode never got the mental health treatment that he— No, I'm talking about injunctive relief going forward. Doesn't the governor's executive order moot out that relief that you're seeking? No, because even the conditions of his confinement after the governor's order, he's still challenging as punishment for exhibiting the symptoms of his mental illness. All the other restrictions— So you're saying, notwithstanding Governor Lamont's order that restricts solitary confinement to no more than 21 hours, has all kinds of conditions and protocols in place to not use, that basically anyone with mental health diagnosis in the prison system cannot be, if they're subjected to solitary confinement, whether they've acted out or not, is a constitutional violation? Is that what you're saying? No, no. Okay, so I'm trying to understand what you are saying. So specifically with respect to Mr. Goode, and the governor's order, I think, did increase the amount of out-of-cell time he got, but all the other restrictions, such as limits on phone calls and everything, were still there. But I think specifically with respect to Mr. Goode, he—administrative segregation, with its various phases, clearly seems to be a program intended for someone to eventually progress out because they're able to meet their requirements. But Mr. Goode needed mental health treatment. He needed, as his expert explained, he needed an individualized treatment plan, which is something that the Connecticut Department of Prison— There's evidence in the record that he was offered treatment, that he refused programming, including mental health, that he wanted to be transferred out of facility, said he would assault someone, in fact, did assault someone when he wasn't transferred. And there's case law out of just about every circuit that says when someone like Mr. Goode— I mean, this is—he's got over 300 disciplinary tickets. At least during the timeframe, looking at a timeline of 2019 to 2021, he's in segregation, but he goes between the phases mostly because there were seven serious assaults on corrections officers. So with that kind of record, you know, when someone says, I'm going to stab someone or I'm going to hurt a corrections officer unless I get A, and then follows through on that threat, what's the prison supposed to do? Sorry, I see I'm eating into my time. So there's evidence in the record that he had access to specific mental health professionals if he sought that. So, for example, he requested the treatment that resulted in him seeing Nurse Reichel, but he needed an individualized treatment plan, which is something that the Connecticut Department of Corrections does offer. Garner offers individualized treatment plans, but Mr. Goode never had an individualized treatment plan specifically to address his mental illness. And so he's not just any other prisoner who's out there, but he specifically was diagnosed with a condition that leads to these uncontrolled outbursts, and he was trying to control them. He sought help, and specifically with respect to that transfer to Garner that didn't happen, he indicated in the affidavit attached to his complaint that he specifically had an issue with one staff member at Garner, so that was something DOC could have worked with him on. He could have perhaps been transferred to a different unit that wasn't the one with that staff member, or if it wasn't safe, they thought, to transfer him to Garner, perhaps they could have provided him with an individualized treatment plan while keeping him at McDougall Walker or Northern, but the fact is DOC just never tried to seriously address his mental health needs and instead just continued to punish him by keeping him in administrative segregation rather than treating his underlying mental illness. All right. Thank you, Ms. Wayne. Mr. Rowley? Thank you, Your Honor. May it please the Court, I am Assistant Attorney General Ed Rowley, and I represent the defendants in this appeal. This court should affirm the merits of the district court's grant of summary judgment to the defendants on plaintiff's eighth amendment claim. This court can also affirm on the alternative grounds of qualified immunity. I'd first like to begin with the merits and specifically the subjective prong, which requires a showing of deliberate indifference on the part of the defendants. Also relevant to that inquiry, and particularly important here, is whether or not Mr. Goode's confinement in AS was related to a legitimate penological purpose. That's been recognized by this court in Supreme Mighty Bourne, Allah. Allah dealt with a pretrial detainee, and the court in Allah found that Connecticut's AS program in 2017, which is more restrictive than it is today, was not categorically out of balance even for pretrial detainees. Mr. Rowley, can I just ask, what is the import of the change in Mr. Goode's conditions or what appears to be the change in conditions from the record from the 2019 to 2021 period and the 2021 to 2023 period? In the state's view, what weight or consideration should we give to the difference in conditions during those two periods? I think our arguments apply equally, but I think they're certainly stronger for the post-2021 period where Mr. Goode's out-of-cell time increased by three to four hours. He had more access to materials, but I believe our arguments equally apply to both. But I think the post-2021 is even stronger and obviously would militate towards the injunctive relief claim. But back to the Allah case, more importantly in regards to the legitimate penological interest, in Allah, the court explained that placement of a pretrial detainee in AS is constitutionally permissible so long as related to a legitimate penological purpose. That premise is confirmed by— I mean, with regard to the objective component, it's not simply that that means everything that they did in their program in 2017 was okay. I mean, we are looking at this specific case. So to the extent that there was evidence that there was more going on, that although the program as a whole can be allowable, it can be appropriate, if the facts in this case support that, in fact, these conditions were not appropriate, we still consider it. There's no blanket sort of exception or blanket statement that this type of confinement was okay because in one particular context, the court said that, yes, you can factor in penological goals and what have you. Correct. I mean, I think on this record, I don't think the objective problems matter. There's even a question of fact. But I'd also point to this court, to the cases that Mr. Goode relies upon in this appeal, including the Third Circuit decision in Porter and the Fourth Circuit decision in Porter, which reinforced this legitimate penological interest. In particular, in the Fourth Circuit decision in Porter, the Fourth Circuit joined the Seventh and Eleventh in holding that a legitimate penological justification can support prolonged detention of a prisoner in segregated or solitary confinement, even though— Before we get there, okay, you can assume that we read those cases and about when solitary confinement is appropriate for penological purposes. But before we get there, we have the objective prong and the subjective prong that he has to meet. Let's forget the objective prong for now. Focus on the subjective prong. Why should we affirm on the subjective prong on his deliberate indifference claim to his mental health? Can you answer that question first before we get to the— Sure, Your Honor. Okay. Two points on that. One is a legitimate penological purpose. But more importantly, I think as Your Honor had pointed out in questioning my co-counsel, Mr. Goode conceded basically the elements below for the subjective prong. I'd highlight a few of those. I think Your Honor already pointed them out, that these wardens were on a multidisciplinary committee that reviewed Mr. Goode's confinement monthly. Part of that committee were mental health and medical professionals who reviewed Mr. Goode's mental health and medical status during those months. And at no point, Mr. Goode concedes this, at no point during any of these monthly reviews were any concerns raised by medical or mental health staff to these wardens. Mr. Goode also conceded that both of these wardens were non-medical or mental health professionals and justifiably deferred and relied upon the medical and mental health professionals. And, of course, there's case law from this circuit and other circuits that support that custody staff's reliance on medical or mental health staff does not constitute deliberate indifference. So I think those concessions in this case clearly show the subjective prong cannot be met. I'd also highlight that Mr. Goode cited the Sixth Circuit case Finley. I think that actually supports our position on the subjective prong. In that case, the Sixth Circuit found a question of fact as the subjective prong because the facts were the exact opposite of what they were here. In the Finley case, the two custody defendants and deputy wardens actually affirmatively disregarded and ignored the mental health professionals' recommendations, including a recommendation from a mental health professional that the prisoner's placement in ADSEC there would deteriorate his mental health condition. On top of that, the deputy warden in that case explicitly acknowledged that she knew that the prisoner couldn't handle those conditions of confinement due to his mental health condition. We have the exact opposite record here where no concerns were raised by any medical and mental health professional, and these custody defendants were certainly justified in relying on those recommendations and input. Mr. Raleigh, just going back to legitimate penological purpose, there seemed to be a gap in the district court record on any inquiry into alternatives to segregation, so assuming the state established legitimate penological purposes given Mr. Goode's extensive history of violence, what engagement was there at the district court level on alternatives to segregation that could still meet that purpose? So I don't think there was much evidence of record put on it, certainly from the plaintiff's side. But, I mean, the old program, ADSEC, has multiple phases with the attempt to try to move them out of the program. Unfortunately, Mr. Goode's own behavior and in-prison conduct prevented that from occurring. As Your Honor alluded to, he engaged in numerous premeditated assaults while in A.S. during the relevant period, including one that resulted in outside criminal charge, a conviction after a jury trial, and a 10-year consecutive sentence. It's precisely the kind of behavior that this court and circuit courts around the country have found justified placing a prisoner like Mr. Goode in these type of conditions, regardless of whether they may or may not pose an objective risk of serious harm, which, of course, we don't believe Mr. Goode has established that on this record. Before my time is up, I'd like to briefly address the issue of qualified immunity. That was not addressed below by the district court as it ruled on the merits, but it certainly provides an alternative grounds for this court to affirm to the extent that this court finds any question of fact as to this objective or objective problem. If we need, if we, if we had to reach qualified immunity, don't you think that would be a better, a better result would be to remand to the court, the district court, to make that determination? The district court never reached qualified immunity, right? Correct. They never did. I mean, it's certainly one option, but I'd urge that this court can reach that question here. Qualified immunity should be addressed as early as possible in the litigation, even if it's on appeal. And the state of the law at the time of the relevant conduct here hasn't changed. And no decision from this court or the Supreme Court have ever held that Mr. Goode's confinement in A.S. violates the Eighth Amendment. There's numerous circuit courts that have upheld conditions that are similar or more restrictive than Mr. Goode's confinement for prisoners who had less serious offenses in prison and were held in those confinement for longer. Even courts that might have found a violation have continued to grant qualified immunity for the lack of a clearly established right. And again, I'd also point this court back to the outlaw decision. If anything, that case establishes that the right is not clearly established and does not exist. And in that decision, the Second Circuit even noted that there's no decision from the Second Circuit of the Supreme Court that prohibits Connecticut's ad sec program in 2017, even if imposed on a pretrial detainee, who of course have greater protections than Mr. Goode does as a sentence prisoner, if it's related to a legitimate penological purpose. In terms of injunctive relief, I asked your opponent about this. I thought I read in your briefing that Mr. Goode is now in general population and that the executive order by Governor Lamont pretty much prohibits solitary confinement to the level of 23 hours, only one hour of recreation. It limits it to only 21 hours in cell, correct? Yes. And other conditions, and there's a protocol that has to be met. Can you talk to us about the effect, I believe you argued this in your brief, of that executive order? Yeah, sure. Just to answer your first question briefly, Mr. Goode is no longer in the AS program. He completed it. He's in general population since I believe last fall. As of today, he's still in general population. Obviously, all that happened after the briefing and the record made below. But yes, the executive order obviously impacts some of the conditions and claims that Mr. Goode originally raised in his complaint below and argued in his appeal, as Your Honor alluded to, including the out-of-cell time and certain restrictions on when they can go back into that confinement. So I see my time is up. I'd ask that this Court affirm for the reasons set forth today as well as those more fully set forth in our brief. Thank you, Your Honors. Thank you, Mr. Riley. Okay. Ms. Wayne, yes, you have two minutes for rebuttal. Thank you. Three quick points. First, with respect to what the wardens were aware of, Mr. Goode specifically wrote to Defendant Mugano about the harsh conditions in administrative segregation and the length of time he was there, but he also wrote to Defendant Barone about how administrative segregation affected his mental health, and that's at JA 531. Second point, with respect to a legitimate penological interest, the defendants had one in separating Mr. Goode that doesn't allow them to continue to hold him there without providing him with necessary mental health care. And that goes to my third point, which is with respect to injunctive relief, there's just no evidence in the record that Mr. Goode actually completed the administrative segregation program such that he is safely no longer at risk of being placed back in the same conditions, and that is why it's important for this court to grant or to allow for the opportunity for an injunction that might prevent Mr. Goode's continued placement in administrative segregation as punishment for exhibiting the symptoms of his mental illness instead of providing him the treatment. You represent him. You don't know what his status is? We know that he's no longer in administrative segregation. We don't know that he can safely progress out again. You don't have access to his records? You represent him. You don't know if he completed the program? I think it seems clear that he hasn't because there's no evidence that he was ever transferred to Garner through the program and then eventually transferred into general population. It seems like he was just transferred straight from phase one of administrative segregation. I guess I'm troubled that you wouldn't know these things representing him. You wouldn't have access to his records to know whether he completed or not. I mean, you have access to all the records, the meetings, when he's in different phases of segregation, but you don't know what's happening with him now? So we've only represented him on appeal, so we have the summary judgment record, to the extent that you have access to that. But speaking to him, he was at McDougall-Walker, and now he's at Corrigan. And there was no period of time to contact him, contact his counselor, through a counselor other than one at McDougall-Walker or one at Corrigan. Isn't there a different problem with injunctive relief? As I understand it from the record, two of the defendants have retired, and they're no longer DOC employees, and the remaining defendant and the northern facility is closed. The remaining defendant was the warden at Walker, where Mr. Good is no longer being held. And then there's no other defendant, and while certainly the warden of Walker could be replaced with whoever the current named warden at Walker is, he hasn't sued the department. He hasn't sued anyone who is currently in charge of his condition. So it's not clear to me, if he were successful in getting injunctive relief, who would be enjoined. Yeah, so the warden was sued in her official capacity, so that would be substituted. But at a facility where he's not being held? At the record show, there were only three facilities where administrative segregation is instituted. That's Northern, which is no longer existent. Garner, which he could actually get mental health care, so I don't think it's at play here. So only McDougall-Walker is the only place he could get placed if he is, again, put in administrative segregation. And there's also no evidence that his mental health needs are being treated with an individualized health care plan. So to the extent he ever commits another violent offense, which is consistent with his diagnosed mental illness, he would get placed at McDougall-Walker, where this problem would immediately recur, because he would then, again, never be able to progress out. Because unless, until he gets treatment for his mental illness, he would just continue to accrue disciplinary violations, which would prevent him from progressing out. I see that my time is expired. So I would ask this Court and some to reverse and allow a jury to determine whether Mr. Goode's prolonged placement in administrative segregation conditions violated the Eighth Amendment. All right. Thank you, Ms. Wink. Thank you to both of you. Very helpful argument. We will take the case under advisement.